Mary Ellen Farr, Co-Counsel, PCC Structurals May it please the Court, Brenda Baumgart Stoll-Reeves on behalf of Defendant PCC Structurals. I'd like to address some of the questions raised by the Court. And I think the place to start is with Plaintiff's fundamental misunderstanding of this case, is that the District Court should have just skipped over the prima facie burden on Plaintiff, an examination of legitimate non-discriminatory reason, and move right to this direct threat defense. It's clear in the record, PCC did not rely on the direct threat defense in its termination of Mr. Mayo. The District Court properly examined, as Judge Smith said, the second prong of the prima facie case, and that is whether or not his admitted acts, threats of lethal violence in the workplace, disqualified him from the ADA and the Oregon law protections as a matter of law. What case do I have that suggests that what we're really concentrating on here is the B prong of the initial prima facie case? If I read the prongs, it seemed obvious to me that in reading them, it would be better put in the C prong. I don't disagree with you, Judge Smith, and the Court can get there either way on de novo review. The District Court chose the B prong in cited cases such as Sullivan, Califf, and other cases cited in our brief. And in our brief, we discussed both of those avenues the Court could go down to arrive at the affirmance of this summary judgment. The cases there, virtually all the other sister circuits who've looked at this question of whether or not an employer has to accommodate misconduct in the form of threats or actual violence in the workplace, even when that is part and parcel of a disability or an alleged disability, have gotten there both ways. They've gotten there under the they're not qualified, and they've gotten there, as the Court did recently in Curley, under the legitimate non-discriminatory reason. Well, I guess my worry is that when I get to the C prong, then I'm really stuck with Humphrey v. Memorial Hospitals Association, which suggests that for purposes of the ADA, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for the determination. So if I read that case very carefully, I'm trying to figure out how I can suggest that he didn't suffer the employment action because of disability, because one could argue it was conduct, but if I follow Humphrey's, the conduct is nothing more than the disability itself. And the Ninth Circuit, bless our hearts, are out there on our own on that particular idea, and therefore it makes it tough for me to get there without undoing something that's my law. Right, and as an advocate for employers, we would be remiss, and I'd have a lot of happy clients if we had someone doing a Humphrey's or a Gambini, but the good news is the Court doesn't have to do that in this case. This case is, number one, factually distinguishable. We are talking about death threats in the workplace. We are talking about admitted threats. We are talking about a plaintiff who says to the HR director and law enforcement, I can't rule it out. And what these cases do, and I think what I would encourage judgment to look at Gambini, which came subsequent to Humphrey, and look at Dark v. Curry County, and this Court was very specific in Gambini, what it was doing and what it was not doing, and particularly when it went back on reconsideration and clarified, and we have this in our brief at page, well, anyway. The point was. Yes, I've got to hear what you're going to say about Gambini, because I'm not sure Gambini changes my idea. Okay. I'm listening. Sure. So in Gambini, which is relied on heavily by not only the, I think the plaintiff in this case relied on it, and then plaintiffs in these similar kinds of situations for the proposition that, listen, if the misconduct flows from the disability, we can't be touched. This is a hall pass. We can get through the accommodation process. You cannot take adverse action against us. And Gambini doesn't say that. What Gambini says is that, listen, this is not a per se safe harbor for disabled employees where the misconduct flows from the disability. Gambini was very specific to those facts, and those facts do not match up with what we have here. Gambini was not a case of workplace violence. Gambini was a case where the employer knew about the disability, where the employer was actively accommodating the disability, and the action of the employee there was to throw a little temper tantrum, crumple up a performance review, hurl profanities at the supervisor. That's not this case where we have a plaintiff who is telling coworkers, I'm going to come down at the swing shift. Don't worry. You won't be here and get caught in the crossfire, and I'm going to take these people out. So, Your Honor, these cases rise and fall on the individual circumstances. Adopting a rule, as the district court did, and adopting the precedent of other circuits that have looked at this at the B level, whether or not this kind of misconduct disqualifies an otherwise disabled employee as a matter of law, is not going to stop that individual inquiry. Courts in those cases will drill down. They will take the employer to task. They will work through those prompts. So if I don't buy that argument, is there another way to save what the district court did? Absolutely, and I would turn the court's attention to Curley. Judge Owens was on that case recently, and I think that's very instructive, as is the Bodenstab, I'm not sure if I pronounced that correctly, case that Curley cited from the Seventh Circuit. And this is the other way that circuits who find that employers do not have to condone threats or actual violence in the workplace, how they get there. And they get there on the C prong, and that is if the employer has proved that the threats violate a conduct policy, be it a formal policy or I think it's just a general matter of common sense so we can't have employees coming into the workplace and threatening or engaging in violent acts against coworkers. That is the legitimate reason, and we end the analysis there. So we're still on prima facie case? Correct. We are still on prima facie case. We are on the prong as to whether or not the employer has articulated a legitimate non-discriminatory reason. Here PCC has. It is undisputed, and I'd like. That's really not the prima facie case if we're down to that. If the employer has had to give a good reason for the termination, then we're at pretext, are we? You're correct. We have moved so that if the burden of production is going to shift to the employer, if the employee has met his prima facie case. And I would just for a moment say that although PCC did not, so it's not one of the primary arguments before the district court, there is argument in the record as to whether or not plaintiff actually can meet that prima facie case. And I would encourage if the court is going to examine that, look closely at what medical records are in the record. And what PCC knew, it is undisputed that at the time Mr. Mayo engaged in those threats, and it came to the attention of Ms. Mubahe and Eileen Drake and the supervisors, and they called the sheriff's department and they took him into the hold, they were wholly unaware of any depression diagnosis. If you look at the paperwork that came in under the family medical leave process, remember we have two things going on here, and I dispute plaintiff's counsel's characterization that his leave was a reasonable accommodation disability leave. It was not. It was a family medical leave. There's no evidence in the record at all that the leave between February 15th and the effective date of the termination, May 20th, was done as a reasonable accommodation. He was given his family leave. The medical information that came in during that time period, which was the family certification and two letters from his treating providers requesting that he be returned to work, look at those. It does not say the reason he made these threats and threatened to kill his coworkers is because of his major depressive disorder. That doesn't come until later in declarations submitted in opposition to summary judgment. So the court does not need to go down that road, but if you do I would encourage you to look closely at what evidence is in the record. As I understand it, your client did not conduct an individual assessment of the plaintiff's ability to perform his job without posing a direct threat, correct? That is absolutely correct, and we don't have to, Your Honor. And then wouldn't that be something maybe we ought to send back at least on the B prong or on the, if you will, pretext prong as additional facts that would be helpful in this case? Absolutely not. And if we look at Curley and we look at Bodenstab, that answers your question. What plaintiffs want to do is to force the burden on, they want to move the burden from the plaintiff in the prima facie or skip over the legitimate non-discriminatory reason pretext and move it into the affirmative defense of direct threat. And this case is not about that. What this court said in Curley is, and in Curley the facts were different than this, in that the employer actually did send that employee out for an independent fit for duty. And what came back is, you're fine to work. After that the employee said, sorry, we're still terminating you and we're terminating you not because we believe you pose a threat going forward. We're terminating you for the past conduct, the threats you made to your coworkers. And there were, I think, three other reasons for termination in that case. And the court distinguished relying on Bodenstab appropriately. Listen, those are two separate avenues of analysis and we are not to conflate them. And that's the same in this case. The legitimate non-discriminatory reason for termination, which is before we get into the affirmative defense, do you pose a direct threat land, was clear on February 15th. It was clear on May 20th. The admitted conduct violates PCC policies. Nobody disputes that. Nobody disputes that's the reason for the termination. The fact that PCC was a careful and considerate employer. And press the pause button. And if you read the deposition testimony carefully of Beaman Pahe and Eileen Drake, you will see that although there might have been some concern, if you will, is he really okay to come back to work? That doesn't somehow unring the bell on the reason that existed on February 15th and that existed on May 20th. And one other point that I think handcuffs plaintiff a little bit with the, significantly with the pretext argument is this. Early on in oral argument, Judge King asked plaintiff's counsel, and I would like to read this colloquy. It's very brief, unless the court has seen this in the record, because I think it's important. Judge King said, well, Mr. Park, doesn't common sense dictate that employers can't be held liable for discrimination when they terminate an employee who openly threatens to kill coworkers in the workplace, regardless of any disability? You just have to look at this from a common sense standpoint. Don't you have to come to that conclusion? Importantly, plaintiff's counsel answers, if that is what had occurred here, Your Honor, was the decision to terminate was acted on, when the threat and incident presented itself, I'd agree with you. Plaintiff concedes PCC had a right to terminate Mr. Mayo on February 15th. If that reason was not pretext on February 15th, it certainly cannot be pretextual on May 20th. The court can affirm summary judgment either on the B prong, finding that Mr. Mayo as a matter of law is not qualified under the Americans with Disabilities Act, or it can do as it recently did in Curley, and affirm that PCC terminated Mr. Mayo for a legitimate, non-discriminatory reason. Are there any further questions? Thank you very much. Thank you. I'll give you 30 seconds to respond. I just want to address that concession argument. The point here is that they didn't, in fact, terminate him. And it may not have been called reasonable accommodation, but they decided, when they found out what happened, that they should send him off and let him get treatment so that he could conform. And then when he came back, there was at least a fact issue as to whether or not they decided to terminate him, not because of these past threats, but because they were afraid that he would become symptomatic again and make threats or become difficult to deal with. And that's the pretext. And that's really the only thing I wanted to say, except that they didn't know at the time that they terminated him and all the information they needed about his depressive disorder. Counsel, I did have a question for you before you sit down, just so I can understand your position in this case. If someone applies for a job and in the interview they say, look, I'm disabled, I have a mental illness, and I will likely threaten to kill my coworkers, under your view of the law where you want us to go, may the employer take that into consideration in the hiring decision? Again, if you do the direct threat analysis, of course, they can take it into consideration and should take it into consideration. And if they want to hire this person, assuming that they do, that this person is perfectly qualified and wonderful. Assume the person, I understand Mr. Mayo was a very good employee. So assume that situation, a very good employee, they normally would hire this person in a millisecond. But this person says it's an interview. Yes, and I'm not suggesting that you actually have to act on threats in order to be in trouble. I mean, you're making threats actually is not okay. So that's something they take into account. I mean, is this person going to be a threat of doing this? Yeah, they can take that into account. So they could decide not to hire someone based on someone saying, because I am disabled, I will threaten my coworkers. If they do an analysis, yes. I mean, it may turn out that he's just saying that, and it's not true. I mean, if they say, okay, well, we're going to need to know something more about this. I'm saying just in the job interview context. So the employer, under your view of the law, would be obligated then, before deciding not to hire someone, to do further analysis as to whether when this guy said this in a job interview, he was serious or not. Again, given that this is the person they want to hire. Yes. Yes, they would have to do something. They would have to find out, is he serious? I mean, is he actually going to start making threats? Okay, thank you very much for your arguments. This case will now be submitted in court. It's at recess until tomorrow.
judges: Hayes, Smith, Owens